BERNARD HUSTON, Appellant, v. CITY OF DES MOINES et al.,
Appellees.

**INJUNCTION:** When Writ Lies—Restraint on Criminal Prosecu-
1   tions. Injunction will lie against a municipal corporation and its
officers, to restrain the enforcement of a void criminal ordinance,
when such enforcement would work an unlawful invasion of
property rights or an irreparable injury.

**CARRIERS:** "Jitneys"—Regulation and Control.   Jitney busses,
2, 10 operated on public streets in a business similar to that trans-
acted by street railways, are common carriers, and subject to
such reasonable regulation and control, even though burden-
some, including the power to license or tax, as the state, or muni-
cipality under state authorization, may determine.

**CONSTITUTIONAL LAW:** Delegation of Authority—Streets, and
3   Highways—Municipal Corporations. The power of the legisla-
ture to regulate and control streets may be delegated to municipal
corporations.   ·

**CONSTITUTIONAL LAW:** Title of Act—Sufficiency—Rule. The title
4   of a legislative act, even though expressed in general terms,
meets every requirement of the Constitution (Sec. 29, Art. 3) if
it reasonably answers as a key to the subject matter of the act.
*Details of the act need not be stated in the title.*

PRINCIPLE APPLIED: The title of an act was: "An act
granting to cities of all classes and towns, power to *license* and
*regulate* so-called 'jitney' busses, and all motor vehicles, operated
upon the streets and avenues of such cities and towns, doing a
business similar to that transacted by street railway companies."
*Held*, sufficient to support a provision in the act authorizing cities
and towns *to exact an indemnity bond* of the jitney operator.

**CONSTITUTIONAL LAW:** Equal Protection of Laws—Regulation
5   of Occupations—Classifications—Jitney Busses. The constitu-
tional principle that *"all laws shall be general and of uniform
operation throughout the state"* (Sec. 6, Art. 1, and Sec. 30, Art.
3, Const.), does not command that a statute or ordinance designed
·   to license and regulate an occupation shall apply to *every* person
engaged in the same general occupation. Legislative acts may
provide any *natural* and *reasonable* classification by which some

engaged in the occupation are amenable to the statute, while others are exempt. *Held,* a classification which excluded street railways and taxicabs from an ordinance regulating and licensing ''jitney'' busses was constitutional, because based on real and substantial· differences.

**CONSTITUTIONAL LAW: Due Process—Police Power—Occupation**
6 **Bonds—''Jitneys.''** The legislature may, in the exercise of its police power and without violating the ''due process'' clause of the Constitution, authorize a municipality, in the regulation of ''jitney'' busses, to exact a reasonable bond from the operator for the protection of the city and public against damages resulting from negligence in the operation of the vehicle. *Held,* a bond of $2,000 was clearly reasonable.

**MUNICIPAL CORPORATIONS: Powers—License Fee—Discretion.**
7 Before it may be said that a license fee is so high that it is, in truth, a revenue measure, it must be made to appear *by the objector* that the fee is *manifestly* more than is sufficient to meet the cost (a) of issuing the license, (b) of·the inspection and regulation of the business, and (c) of the *incidental* consequences that may be likely to result in licensing the business. *Held,* an annual license fee exacted of ''jitney'' bus operators, ranging, according to seating capacity, from $1.25 to about $3.00 per month, was not shown to be a revenue measure.

**MUNICIPAL CORPORATIONS: Powers—Regulation of Occupa-**
8 **tions—Jitney Busses.** The power ''to regulate'' jitneys and motor vehicles, operated on the public streets in a business similar to that transacted by street railway companies, embraces the power to require that to be done which is fairly in the interest of· public welfare and safety.

PRINCIPLE APPLIED: The power ''to regulate and license jitneys'' is held to arm the city with power:

1. To require an application for license, stating the type of motor car and the horse power, factory. number, state license number and seating capacity thereof, and the name, age and residence of driver.

2. To require the driver to be at least 18 years of age.

3. To require a statement of the termini between which the car is to operate and a schedule of·the times of departure therefrom.

4. To grant the application as filed or as the council may modify it.

5. To refuse the application if the council finds that the applicant is unqualified, the car unsafe, the territory already

properly supplied with transportation facilities, or the schedule unsatisfactory.

6. To modify the schedule after granting the license.

7. To punish the operation of jitneys without a license.

8. To punish a violation of the schedule.

9. To require the license number to be conspicuously displayed on the car.

10. To prohibit trailers.

11. To prohibit the carriage of passengers on running boards, etc.

12. To prohibit more than one passenger's riding on the driver's seat.

13. To prohibit the reconstruction of the car without the council's consent.

14. To prohibit the running of cars unless, from a half hour after sunset to a half hour before sunrise, the inside of the car is illuminated.

15. To compel stops at all railway crossings.

16. To prohibit overloading of cars.

17. To affix penalties for violations.

**STATUTES: Construction—Motives Actuating Legislature.** The motive in passing a statute or ordinance, beyond what is revealed by the law itself, is not a matter into which the courts will make inquiry.

**CARRIERS: "Jitneys"—Regulation and Control.**

**MUNICIPAL CORPORATIONS: Powers—Presumption as to Validity of Acts.** The reluctance of the courts to interfere with and declare invalid duly enacted laws leads to the rule that, when the legislature has expressly empowered municipalities to regulate and license occupations which involve the use of the public streets, a broad presumption exists in favor of the validity of the ordinance enacted under the powers granted; and he who attacks such ordinance must show affirmatively that it is not expressly authorized by statute, or that it is, as applied to him, manifestly unreasonable and oppressive. So held in passing on the validity of an ordinance regulating jitney busses.

**MUNICIPAL CORPORATIONS: Powers—Express Legislative Grant.** If an ordinance be passed in virtue of express legislative power and substantially follows the powers granted, a court will sustain it, regardless of its opinion as to the reasonableness of the ordinance.

*Appeal from Polk District Court.*—HUBERT UTTERBACK,
Judge.

SATURDAY, MARCH 11, 1916.

REHEARING DENIED WEDNESDAY, JUNE 28, 1916.

ACTION to test the validity of a statute and an ordinance
of the defendant city licensing and regulating what are known
as "jitneys." The trial court sustained both, and plaintiff
appeals.—*Affirmed.*

*A. D. Pugh,* for appellant.

*H. W. Byers, Eskil C. Carlson* and *Earl M. Steer,* for
appellee.

*Wm. Chamberlain, Amicus Curiae.*

DEEMER, J.—The last general assembly (36th) passed an
act authorizing cities and towns to regulate "jitney" busses.
This act read as follows:

"Cities and towns including cities acting under the com-
mission form of government, and cities acting under special
charter, shall have power to regulate and license so-called 'jit-
ney' busses, and all motor vehicles operating upon the streets
and avenues of such cities and towns and engaged in carrying
passengers for hire, on a plan similar to that followed by street
railway companies; to fix and determine the streets and ave-
nues upon which they shall be permitted to operate; to require
such vehicles to be operated over reasonable routes, and upon
reasonable schedules; to require the owners or operators
thereof to file with such city or town, a proper indemnity bond
for the protection of the city or public against damages result-
ing from negligence in the operation of such vehicles; and to
impose penalties within the limits of Section 680 of the Code
for the violation of any ordinance enacted hereunder. Pro-
vided that 'jitney' busses shall not be excluded from streets

on which street cars are allowed to operate." Sec. 754-a, Supplemental Supplement to the Code, 1915.

Prior to the adoption of this act, there seems to have been no limitation upon the business, and many such busses were in operation upon the streets of various cities of the state. Pursuant to the delegation of power found in the act of the legislature, the city of Des Moines passed a regulatory and license ordinance as follows:

"The council of the city of Des Moines ordains as follows:

"Section 1. Definitions: Unless it appears from the context that a different meaning is intended, the following words shall have the meanings attached to them by this section: The word 'street' shall mean and include any street, alley, avenue, court, lane, or public place in the city of Des Moines. The words 'motor bus' shall mean and include any motor vehicle engaged in the business of carrying passengers for hire, which is held out or announced by sign, voice, or other device, or advertisement, to operate or run over a particular route, or to a particular point, or between particular points. Automobiles used exclusively for hotel busses shall not be considered motor busses within the meaning hereof. The word 'person' shall mean and include any person, firm, association and corporation.

"Section 2. No person shall operate a motor bus in the city of Des Moines without a license therefor, and no license certificate therefor shall be issued in any other than the following manner: The person desiring a license to operate a motor bus shall file with the city clerk an application therefor stating: (a) The type of motor car to be used as such bus; (b) the horsepower thereof; (c) the factory number thereof; (d) the state license number thereof; (e) the seating capacity thereof according to its trade rating. If the motor car has been adapted for use as a bus either by converting a freight-carrying truck into a passenger vehicle, or by reconstructing, modifying or adding to the body of seating arrangements of

a passenger-carrying motor car, a statement of (1) its carrying capacity in pounds or tons, (2) its seating capacity as adapted, and (3) the method and material used in such adaptation, shall be added. (f) The age, name, and residence of the person to be in immediate charge thereof as driver and a statement showing that said driver has attained the age of 18 full years. (g) The termini between which such motor bus is to be operated; and (h) a schedule showing the times of departure from the termini, according to which it is intended to operate such motor bus.

"The city clerk shall promptly refer such application to the superintendent of public safety, who, at the next regular meeting of the council occurring after such filing, shall present the same to the council with his recommendation thereon. The council may grant such application as filed, or grant the same as it may be modified by said council, or if it shall find that the person named in sub-division (f) of this section is not qualified by experience or otherwise to operate such motor bus, or that the motor car described in such application is not a safe car for use as a motor bus, or that the territory between the termini described in such application is supplied with ample public motor bus transportation facilities, or that the schedule described in such application is not satisfactory, the council may deny such application. Upon the granting of such application as filed or modified, and the payment of the required license fee, the city treasurer shall issue a certificate of license to operate or cause to be operated the motor bus described between the termini and according to the schedule therein stated (or modified), and between no other termini and according to no other schedule. The termini and schedule stated in such license certificate may be altered by order of the council made upon motion, either upon application of the person holding such license, or upon the initiative of the council.

"Section 3. The license fees herein provided for are fixed as follows: For each motor bus capable of seating 5

or less persons, including the driver, $15 per year. For each motor bus capable of seating more than 5 and less than 8 persons, including the driver, $20 per year. For each motor bus capable of seating more than 7 and less than 16 persons, including the driver, $25 per year. For each motor bus capable of seating more than 15 and less than 30 persons, including the driver, $30 per year. For each motor bus capable of seating 30 persons or over, including the driver, $35 per year.

"Section 4. Whenever any person operating any motor bus under a license issued according to the terms of this ordinance shall plead guilty to or be convicted of the violation of any of the provisions hereof, or any of the provisions of any ordinance of the city of Des Moines, or law of the state of Iowa, relating to traffic and the use of streets, it shall be the duty of the judge of the court wherein such plea of guilty is entered or conviction had, to determine whether or not the offense involved is of such gravity that the license under which such person is operating should, in the interest of public safety, be revoked. In case such judge shall determine that such license should be revoked, he shall make his recommendation to the council of the city of Des Moines to that effect. The council shall consider and act upon such recommendation and may revoke, suspend, or continue in force such license, as it may deem proper.

"Section 5. Any person holding a license to operate a public automobile in the city of Des Moines at the time this ordinance takes effect may surrender the same and shall thereupon be entitled to credit for the value of the unexpired portion thereof, prorated according to time, in payment of a license fee hereunder. Any person operating a motor bus, as defined herein, prior to the introduction of this ordinance, under a public automobile license, who shall file an affidavit stating that he has elected to retire from business because of the adoption of this ordinance, shall be entitled to a refund of the value of his unexpired license prorated according to

time; provided that said affidavit shall be made within fifteen days after this ordinance goes into effect, but after the expiration of the said fifteen days no person holding a license to operate a motor bus under the provisions of this ordinance shall be entitled to a refund or rebate thereon under any condition.

"Section 6.   It shall be unlawful:   (a) To drive or operate any motor bus upon or along any street unless there is outstanding a valid license for such bus; or (b) to fail, refuse, or neglect to operate a motor bus between the termini and according to the schedule stated in the application upon which the license for such motor bus was granted, except upon the surrender of such license; or (c) to drive or operate a motor bus without the city license number thereof displayed in a prominent place and in figures not less than two inches in height upon the right hand side of the body thereof; or (d) to drive or operate any motor bus while there is attached thereto any trailer or any other passenger-carrying vehicle; or (e) to drive or operate a motor bus under the provisions of this ordinance while any person is standing or sitting upon any running board, step, fender, or door thereof, or while any person riding on such motor is outside of the body thereof. It shall be unlawful for said motor to carry more than one passenger in the front seat next to the driver or operator thereof; or (f) to drive or operate any motor bus upon any street unless he shall have given and there is in full force and effect at all times, while such person is driving and operating such motor bus under a license of the city clerk, an indemnity bond as surety in the sum of $2,000, which bond shall inure to the benefit of any person or persons who may receive bodily injuries or suffer death by reason of the negligence or misconduct on the part of the driver or operator of such motor bus; or (g) to reconstruct, materially alter, modify, or add to the body or seating arrangements of any motor bus, after the license therefor is issued, without first applying for and receiving the consent of the council; or (h) to drive or oper-

ate any motor bus during the period from a half hour after sunset to a half hour before sunrise unless the inside of the body thereof shall be effectually illuminated; or (i) to drive or operate a motor bus under the provisions of this ordinance without bringing said motor bus to a full stop before crossing the line of any street railway, interurban or steam railway within the city of Des Moines, Iowa.

"Section 7. Any person who shall violate any provision of this ordinance shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding $100 or by imprisonment in the city jail not exceeding 30 days."

At the time of the passage of the law and ordinance before quoted, plaintiff was engaged in the business of carrying passengers for hire in defendant city, and had paid all state and city license fees and taxes, and he alleged, in his petition, that neither he nor other persons engaged in the business, could comply with the terms of the ordinance; and that the effect thereof, if enforced, would destroy their business, and also deprive them of the means of making a livelihood; that the license fee and the regulatory provisions of the ordinance, if enforced, would make the business so burdensome as to be unprofitable, and have the effect of driving motor busses from the streets of the defendant city; that the statute before quoted, and the ordinance, are unconstitutional, arbitrary and unreasonable, beyond the power of either the legislature or the city council, and therefore void; and that plaintiff has no plain, speedy, or adequate remedy at law. He asked that the city and its officers be enjoined from enforcing the same; that the statute and ordinance be declared unconstitutional and void, and for other equitable relief.

Defendants appeared and filed a demurrer to the petition, and this demurrer was sustained. No temporary writ of injunction was ever issued; but, upon appeal to this court, a restraining order was issued, in aid of our appellate jurisdiction, and this restraining order is now in force. The demurrer

was the general one, authorized by statute where the action is in equity, bottomed upon the thought that plaintiff was not entitled to the relief demanded, or to any equitable relief whatever.

I. The appeal brings many questions before us. At the threshold, plaintiff's right to maintain such an action is questioned. It is said that this is nothing more than an action in

1. INJUNCTION: when writ lies: restraint on criminal prosecutions.

equity, to restrain the enforcement of a criminal statute, or an ordinance imposing a penalty, and that such an action will not lie. It is true that, as a general rule, a suit in equity will not lie, to enjoin or restrain the enforcement of a statute imposing a penalty, or an ordinance to which a penalty for its violation is attached, as is pointed out in *Ewing v. City of Webster City,* 103 Iowa 226; *Majestic Theatre Co. v. City of Cedar Rapids,* 153 Iowa 219, and other like cases. But there are several well-recognized exceptions to this general rule, some of which we have heretofore recognized. See *Bear v. City of Cedar Rapids,* 147 Iowa 341, and the *Majestic Theatre* case, supra. In *Ewing's* case, we approved of the doctrine stated in *City of Austin v. Austin City Cemetery Association* (Tex.), 28 S. W. 528 (47 Am. St. 114), wherein it was said that, if plaintiffs would suffer an irreparable injury, and there is no other plain, speedy, and adequate remedy, an injunction will lie. Indeed, the general doctrine now is that, if the enforcement of a statute or ordinance which it is claimed is invalid and void, amounts to an invasion of property rights or an irreparable injury, an injunction will lie. The cases are so numerous on this subject that no attempt will be made to cite them all. Among others, we find the following: *City of Rushville v. Rushville Nat. Gas Co.* (Ind.), 28 N. E. 853; *Deems v. Mayor, etc., of Baltimore* (Md.), 30 Atl. 648 (26 L. R. A. 541); *Appeal of Harper* (Pa.), 1 Atl. 791; *Morris Canal Co. v. Mayor, etc., of Jersey City,* 12 N. J. Eq. 252; *Southern Express Co. v. Mayor, etc., of Ensley,* 116 Fed. 757; *City of Chicago v. Collins* (Ill.), 51 N. E. 907; *City of Hut-*

*chinson v. Beckham,* 118 Fed. 399; *Port of Mobile v. Louis-ville & N. R. Co.* (Ala.), 4 So. 106; *Cicero Lbr. Co. v. Town of Cicero* (Ill.), 51 N. E. 758 (68 Am. St. 155); *New Orleans B. & A. Co. v. City of New Orleans* (La.), 42 So. 784 (7 L. R. A. [N. S.] 1014); *Dobbins v. Los Angeles,* 195 U. S. 223 (49 L. Ed. 169); *Schlitz Brewing Co. v. City of Superior* (Wis.), 93 N. W. 1120; *Philadelphia Co. v. Stimson,* 223 U. S. 605 (32 Sup. Ct. Rep. 340); *South Covington & C. St. R. Co. v. Berry* (Ky.), 18 S. W. 1026; *Fellows v. City of Charles-ton* (W. Va.), 59 S. E. 623 (13 L. R. A. [N. S.] 737); *Geneva F. M. Co. v. Karpen,* 238 U. S. 254 (35 Sup. Ct. Rep. 788); *Ex parte Young,* 13 L. R. A. (N. S.) 932 and cases cited in note; *Smyth v. Ames,* 169 U. S. 466; *Hunter v. Wood,* 209 U. S. 205 (28 Sup. Ct. Rep. 472).

In the *Dobbins* case, supra, the following principles were announced:

"1. Municipal ordinances, and even legislative enact-ments, . . . are subject to investigation in the courts, with a view to determining whether the law or ordinance is a law-ful exercise of the police power, or whether, under the' guise of enforcing police regulations, there has been an unwar-ranted and arbitrary interference with the constitutional rights to carry on a lawful business, to make contracts, or to use and enjoy property. 2. While the right to exercise the police power is a continuing one, and a business lawful today may in the future . . . become a menace to the public . . . welfare and be required to yield to the public good, the exer-cise of the police power is subject to judicial review, and property rights cannot be wrongfully destroyed by arbitrary enactment. 3. Although an ordinance may be lawful on its face and apparently fair in its terms, yet, if it is enforced in such a manner as to work a discrimination against a part of the community for no lawful reason, such exercise of power will be invalidated by the courts. 4. Where property rights will be destroyed, unlawful interference by criminal pro-

ceedings under a void law or ordinance may be reached and controlled by a court of equity.''

As plaintiff claims the protection of the 14th Amendment to the Constitution of the United States, the doctrine of the *Dobbins* case must be regarded as controlling.   Other cases might be cited; but enough have been referred to, to justify the holding that, under the allegations of the petition, such interference with plaintiff's property and property rights is threatened by the ordinance that he has the right to maintain his action in equity, not to stay criminal prosecutions under the ordinance, but to determine whether or not plaintiff must comply with all its terms, or else go out of the ''jitney'' bus business, a business in which he was lawfully engaged, before the ordinance was passed.   His action is not bottomed on the thought that he wishes to escape criminal prosecution, but upon the right to use his property and continue his business, without complying with what he alleges to be an unconstitutional law, and an invalid ordinance.   This is no new exercise of the powers of a court of chancery, as an examination of the authorities cited will show.   There is no difficulty here, as in many of the cases relied upon by appellee, about suing the state.   The action is against a municipal corporation, which may always be sued, and the officers of that corporation, who may be joined with it; and, under all precedents, such an action will lie.

II.   We now come to the main points made against the act of the legislature.   Some of them are common to both the statute and the ordinance, but not all; and, so far as they are in common, we shall treat them together, in

2. CARRIERS: "jitneys:" regulation and control.   this division of the opinion.   Although ''jitney'' busses are new, the principles whereby they may be governed, are old.

In the first place, ''jitney'' busses, as defined both in the statute and the ordinance, are common carriers, doing an intrastate business upon the streets of defendant city, and,

as such, are subject to such reasonable regulation, and control as the proper governing bodies may determine; and this control involves the right to license or tax the same. *City of Memphis v. State* (Tenn.), 179 S. W. 631; *Van Hoefen v. Columbia Taxicab Co.* (Mo.), 162 S. W. 694; *State v. Howell* (Wash.), 147 Pac. 1159; *Hendrick v. State of Maryland*, 235 U. S. 610 (35 Sup. Ct. Rep. 140); *State v. Barbelais* (Me.), 64 Atl. 881; *Fifth Avenue Coach Co. v. City of New York* (N. Y.), 86 N. E. 824 (16 A. & E. Ann. Cas. 695); *Hoefling v. City of San Antonio* (Tex.), 20 S. W. 85 (16 L. R. A. 608); *Stanley v. City of Davenport*, 54 Iowa 463; *State v. Des Moines City R. Co.*, 159 Iowa 259; *Commonwealth v. Kingsbury* (Mass.), 85 N. E. 848; *City of Des Moines v. Keller*, 116 Iowa 648; *Munn v. Illinois*, 94 U. S. 113 (24 L. Ed. 77).

What the legislature may do itself, in the matter of regulation and control of streets in a municipality, it may delegate to a municipality to do, itself. *Des Moines v. Keller*, supra; *Stanley v. Davenport*, supra; *Gundling v. Chicago*, 177 U. S. 183 (20 Sup. Ct. Rep. 633). But the city must act within the power given, or necessarily implied.

*3. CONSTITUTIONAL LAW: delegation of authority: streets and highways: municipal corporations.*

The statute itself is a broad grant of power to all municipalities within the state to regulate and license "jitney" busses and motor vehicles carrying passengers on a plan similar to that followed by street railway companies. And it authorizes them to fix the streets upon which they may operate; to regulate the routes and schedules; to require owners and operators to give a bond for the protection of the city and the public, against damages resulting from negligence in the operation thereof; and to impose penalties for the violation of the ordinance. The title to the act was as follows:

*4. CONSTITUTIONAL LAW: title of act: sufficiency: rule.*

"An act granting to cities of all classes, and towns, power to license and regulate so-called 'jitney' busses, and

all motor vehicles, operated upon the streets and avenues of such cities and towns, doing a business similar to that transacted by street railway companies."

The act is challenged, because the title is not comprehensive enough to cover the giving of an indemnity bond. This was a mere detail of regulation, and the title was sufficient, under our previous decisions. *Beaner v. Lucas*, 138 Iowa 215; *State v. Grefe*, 139 Iowa 18; *State v. Fairmont Creamery Co.*, 153 Iowa 702; *Schultz v. Parker*, 158 Iowa 42; *City of Newton v. Board of Supervisors*, 135 Iowa 27.

The chief complaint made of the statute is that it is discriminatory in character; class legislation; grants a monopoly to street railway companies, and destroys plaintiff's property.

5. CONSTITU-
TIONAL LAW:
equal protec-
tion of laws:
regulation of
occupations:
classifications:
jitney busses.

Again, it is said that the provision as to an indemnity bond is illegal and invalid, because it deprives plaintiff of his property without due process of law, is arbitrary, unreasonable, discriminatory and unjust. That the act does single out "jitney" busses and motor vehicles operating upon city streets, upon a plan similar to that followed by street railways, is clear; and it is also patent that neither street railways nor taxicabs are included. But it does cover all "jitney" busses, and all motor vehicles operating under the plan mentioned; and, if the classification is not arbitrary and unjust, it is not vulnerable to any constitutional objection. *State v. Fairmont Creamery Co.*, 153 Iowa 702; *Hubbell v. Higgins*, 148 Iowa 36; *State v. Grefe*, 139 Iowa 18; *City v. Bolton*, 128 Iowa 108; *Des Moines Street R. Co. v. Des Moines Broad Gauge Street R. Co.*, 73 Iowa 513; *McGuire v. Chicago, B. & Q. R. Co.*, 131 Iowa 340; *Cargill v. State*, 21 Sup. Ct. Rep. 423; *Barbier v. Connolly*, 5 Sup. Ct. Rep. 357 (113 U. S. 27); *Nitka v. Western Union Tel. Co.* (Wis.), 135 N. W. 492. In *Hubbell's* case, supra, we said:

"Legislation in favor of different classes of individuals, in order to be valid, must extend to and embrace equally all persons who are or may be in like circumstances, and the

classification must be natural and reasonable, not arbitrary or capricious. . . . Classification, to be constitutional, must be based upon substantial distinction which makes one class so different from another as to suggest the necessity of different legislation with respect to it. Laws public in their objects may be confined to a particular class of persons if they are general in their application to the cases to which they apply, provided the distinction is not arbitrary but rests upon some reason of public policy. Classification must be reasonable and based upon real differences in the situation, conditions and tendencies of things. If there is no real difference between persons, occupations, or property, the state cannot make one in favor of some persons over others. The true practical limitation of the legislative power to classify is that the classification shall be upon some apparent natural reason, some reason suggested by necessity, by such a difference in the situation and circumstances of the subjects placed in different classes, as suggest the necessity or propriety of different legislation with respect to them. *State v. Garbroski,* 111 Iowa 496; *Bailey v. People,* 190 Ill. 28 (60 N. E. 98; 54 L. R. A. 838; 83 Am. St. 116); *State v. Cooley,* 56 Minn. 540 (58 N. W. 150); *State v. Mitchell,* 97 Me. 66 (53 Atl. 887; 94 Am. St. 481); *Nichols v. Walter,* 37 Minn. 264 (33 N. W. 800). Legislation which affects alike all persons similarly situated is not class legislation. *Sisson v. Board of Supervisors,* 128 Iowa 462; *Barbier v. Connolly,* 113 U. S. 27 (5 Sup. Ct. Rep. 357; 28 L. Ed. 923); *Hayes v. Missouri,* 120 U. S. 68 (7 Sup. Ct. R. 350; 30 L. Ed. 578)."

And in *State v. Creamery Co.,* supra, we stated the rule as follows:

"Does the act in question offend against the Constitution in that its operation is not uniform, or in that it grants immunities to some classes of citizens which are withheld from others? That the act constitutes special legislation, and that its practical application will be limited to comparatively few persons, must be conceded. But this is not sufficient to con-

demn. A very large part of all legislation is subject to this characterization. *McAunich v. R. Co.* 20 Iowa 338; *Missouri Pac. R. Co. v. Mackey,* 127 U. S. 205 (8 Sup. Ct. Rep. 1161; 32 L. Ed. 107). It is urged by appellee that the classification adopted in the act is purely arbitrary and unreasonable, and that it rests upon no natural basis. No very definite rule has ever been laid down whereby the reasonableness of a statutory classification may be determined. In the very nature of the case no definite rule is possible for such purpose. Generally speaking, classification must be based upon substantial distinction which makes one class so different from another as to suggest the necessity of different legislation with respect to it. It must be natural and reasonable and not arbitrary or capricious. The legislation must extend to and embrace accurately all persons who are or may be in like circumstances. . . . For the purpose of the consideration of the reasonableness of the classification in question, we must take note of matters of common knowledge and of common report. *McGuire v. C. B. & Q.* supra; *Chicago, B. & Q. R. Co. v. McGuire,* 219 U. S. 549 (31 Sup. Ct. Rep. 259; 55 L. Ed. 328). . . . The Constitution was intended to announce certain basic principles to serve as the perpetual foundation of the state. It was not intended to be a limitation upon its healthful development, nor to be an obstruction to its progress. New days bring new problems. Legislation must meet these problems as they come; otherwise our plan of government must prove inadequate. Manifestly, we ought not to be swift to adopt such a technical or strained construction of the Constitution as would unduly impair the efficiency of the legislature to meet its unavoidable responsibilities. Turning to our own previous cases, great liberality has always been indulged in the matter of classification. In *McAunich v. R. Co.,* 20 Iowa 338, the rule is stated as follows: 'These laws are general and uniform, not because they operate upon every person in the state, . . . but because every person who is brought within the relations and circumstances provided for

is affected by the law. They are general and uniform in their operation upon all persons in the like situation, and the fact of their being general and uniform is not affected by the number of persons within the scope of their operation.' "

It is manifest that there is a great difference between "jitney" and motor busses, and street railways. The latter operate on fixed tracks; have regular routes and schedules; are operated under franchises which usually safeguard the right of the city and the public; they are compelled to pay taxes and for paving; have large investments, and their property is liable for judgments for personal injuries, which judgments are prior liens even to mortgages. See Code Sec. 2075. Not so with "jitney" busses. Taxicabs do not operate over fixed routes, or upon any schedules. They are more like the ordinary busses or carriages, which make short occasional runs upon special orders; charge large fees; do not ordinarily compete with street cars; are not numerous, in that they are not confined to any special routes; are not required to make any particular routes; and are generally owned and operated by responsible companies. They differ essentially from street cars, and do not serve the general public, as do "jitneys." On account of larger fees, their runs are less frequent, are not confined to fixed routes, and do not congest the traffic, as do "jitneys," which are especially authorized to operate on streets which are occupied by street cars. The taxi driver, whenever possible, avoids these streets, and gets out of the congested district as soon as practicable. Such differences are sufficient to justify the classification found in the act in question. *Jeffrey Mfg. Co. v. Blagg,* 235 U. S. 571 (35 Sup. Ct. Rep. 167); *Ex parte Sullivan* (Tex.), 178 S. W. 537; *Greene v. City of San Antonio* (Tex.), 178 S. W. 6; *Nolen v. Riechman,* 225 Fed. 812; *Virginia R. & Power Co. v. Jitney Association,* 1 Virg. Law. Reg. [N. S.] 102; *Ex parte Cardinal* (Cal.), 150 Pac. 348.

The statute itself does not fix the fees for the license, and that branch of the case will be treated in a subsequent division

of this opinion. It does authorize and require an indemnity bond, to protect any person or persons who may receive bodily injuries or suffer death, by reason of negligence or misconduct on the part of the driver or operator of the machine, the amount of the bond being fixed at $2,000.

6. CONSTITU-
TIONAL LAW:
due process:
police power:
occupation
bonds: "jit-
neys."

The act is challenged because the bond is prohibitive; deprives plaintiff of his property without due process of law; is unjustly discriminatory, and in restraint of trade. We have already observed that the requirement of the bond from "jitney" bus owners and operators is not invalid because of its being class legislation, and need only observe that the requirement of such bonds is in aid of injured parties, and is not a new species of legislation. Of the many cases upholding such a right, see *Taylor v. Dunn* (Tex.), 16 S. W. 732; *Nelson Co. v. Stephenson* (Tex.), 168 S. W. 61; *Ex parte Dickey* (W. Va.), 85 S. E. 781; *Greene v. City*, supra. Bonds have been required from persons authorized to sell liquors, which were made to inure to the benefit of anyone injured, and such requirements have been upheld. *Peavy v. Goss* (Tex.), 37 S. W. 317; Black on Intoxicating Liquors, Sec. 197; Freund on Police Power, Sec. 40; *Wiggins v. City*, 68 Ill. 372; *Marshall County v. Knoll*, 102 Iowa 573. Bonds have also been required from persons using public streets for private purposes, auctioneers, merchants selling certain kinds of products, etc. See *Hawthorne v. People*, 109 Ill. 302 (50 Am. Rep. 610); *City v. Western Union Tel. Co.* (Ore.), 146 Pac. 148; *Springfield Water Co. v. Burgess, etc., of Darby* (Pa.), 49 Atl. 275. Several cases have been before the courts in which the validity of a bond provision in statutes and ordinances authorizing "jitney" busses has been attacked, but in none save one from a Federal district judge has the attack been successful. On the contrary, with great unanimity, these bond provisions have been upheld. See *Nolen v. Riechman*, supra; *Ex parte Sullivan* and *Hawthorne v. People*, supra; *City of Memphis v. State* (Tenn.), 179 S. W. 631; *Le Blanc v. City of New Orleans* (La.), 70

So. 212; *State v. Mayo* (Me.), 75 Atl. 295. These are all the points of attack made upon the statute, and we find that none of them are based upon substantial grounds.

III. Coming now to the ordinance passed by the city council in virtue of the statute, it is claimed that the bond, as fixed, is prohibitive. If a bond may be required at all for the purpose of indemnifying the public,—

7. MUNICIPAL CORPORATIONS: powers: license fee: discretion.
which, of course, means the individuals going to make up that public, else it means nothing,—it is perfectly apparent that the bond, rather than being excessive, is, to say the least, inadequate in amount, as compared with the damage which may be done any day, through the carelessness of an operator. If it results in keeping irresponsible people off the street, it is not an unmixed evil. That it will have a tendency to make drivers more careful in the operation of their machines, needs no argument, and that it may be beneficial to the owner or operator himself, is not beyond the pale of reason. Many private individuals carry automobile insurance, believing it to be a good business investment, and this has not been productive of accidents. But aside from all speculation upon the point, it is clear that, if any bond may be required for the purposes indicated, the one fixed by the council is not unreasonable. The power given by the statute is to license, and not to tax; and plaintiff claims that the fees fixed by the ordinance are so large as to indicate that they are, in truth, intended as a revenue measure, and should be treated as an occupation or other tax, and the ordinance set aside for this reason. The fees are graduated ones, as follows: For each motor bus seating 5 or less, including driver, $15 per year, or $1.25 per month; for those seating more than 5, and less than 8, $20 per year, or $1.60 per month; for those seating more than 7, and less than 16, $25 per year; for those seating 15, and less than 30, $30 per year; and for those seating 30 or over, $35 per year. It is true, of course, that, under power to license, the city has no authority to tax; but the mere fact that license

fees may result in producing a revenue which may be paid into the city treasury for the use of a special or the general fund, does not of itself deprive the assessment of the character of a police regulation. In *Ex parte Gregory*, 20 Texas Ct. App. 210 (54 Am. Rep. 516), the supreme court of Texas, quoting from other decisions, announced the rule as follows:

"It is not to be confined to the expense of issuing it, but that a reasonable compensation may be charged for the additional expense of municipal supervision over the particular business. . . . In fixing upon the fee it is proper and reasonable to take into account, not the expense merely of direct regulation, but all the incidental consequences that may be likely to subject the public to cost in consequence of the business licensed. In some cases the incidental consequences are much the most important, and indeed are what are principally had in view when the fee is decided upon. . . . And all reasonable intendments must favor the fairness and justice of the fee thus fixed; it will not be held excessive unless it is manifestly something more than a fee for regulation."

See also *Ex parte Cramer*, Am. & Eng. Ann. Cas. 1913 C. p. 588 and note; *Vernor v. Secretary of State* (Mich.), 146 N. W. 338. Our own cases support this proposition. *City v. Putnam Ins. Co.*, 31 Iowa 102; *Iowa City v. Newell*, 115 Iowa 55; *City of Ottumwa v. Zekind*, 95 Iowa 622; *State v. Wheelock*, 95 Iowa 577; *City of Burlington v. Bumgardner*, 42 Iowa 673; *Town of Decorah v. Dunstan*, 38 Iowa 96. It does not appear to which class of machines plaintiff's "jitney" belongs. If to the five or seven passenger class, it would seem that the fees are not exorbitant, in view of the necessity of police control and inspection; and, in order to have the ordinance rejected on the ground that it imposes a tax, plaintiff must show that such a tax is imposed upon him, and that the amount he is required to pay, cannot be justified as a police or regulatory measure. This is fundamental law, not requiring the citation of authorities in its support. In some of the cases already cited, the license fees were not mate-

rially larger than the ones fixed by the ordinance in question, and we think plaintiff must fail at this point. In Cooley on Taxation (3d Ed.), Vol. 2, the learned author, at pp. 1141, 1142, and 1143, says:

"When a grant (of power) 'is not made for revenue, but for regulation merely, a much narrower construction is to be applied'" than where it confers the power also of raising revenue. But even where it is for regulation merely, "a fee for the license may still be exacted; but it must be such a fee only as will legitimately assist in the regulation; and it should not exceed the necessary or probable expense of issuing the license and of inspecting and regulating the business which it covers. . . . But the limitation of the license fee to the necessary expenses will still leave a considerable field for the exercise of discretion, when the amount of the fee is to be determined. . . . In fixing upon the fee, it is proper and reasonable to take into account, not the expense merely of direct regulation, but all the incidental consequences that may be likely to subject the public to cost in consequence of the business licensed. In some cases the incidental consequences are much the most important, and, indeed, are what are principally had in view when the fee is decided upon. . . . And all reasonable intendments must favor the fairness and justice of a fee thus fixed; it will not be held excessive unless it is manifestly something more than a fee or regulation."

See also 3 McQuillin on Municipal Corporations, Sec. 991, and cases cited. A fault in appellant's argument, in this connection, lies in the assumption that neither the state nor the city could deprive him of the right to use the streets with his "jitney" bus; and that the exaction of a license fee deprived him of that right. As seen in the first division of this opinion, the first premise is incorrect, and it follows that the conclusion is bad. See also *Ex parte Dickey* (W. Va.), 85 S. E. 781; *Goddard v. Chicago & N. W. R. Co.* (Ill.), 66 N. E. 1066.

IV. Many other complaints are made of the ordinance, most of which have been met by what we have already said.

These provisions are all regulatory in character.  Section 2
of the ordinance is clearly within the domain

**8. MUNICIPAL CORPORATIONS: powers: regulation of occupations: jitney busses.**

of regulation.  Section 3 does not delegate the power of revocation of the license to the judicial branch of the government, but merely provides for a finding by a judge trying a case to which the holder of the license is a party, and upon this, the city council may act.  It is not required to cancel the license, even upon conviction.  There is nothing here of which appellant may complain.  The power of revocation of a license may be vested in courts, as a part of the punishment for violation of the provisions of an ordinance.

Section 6 has reference to the manner of operation of motor busses; and, while some of its provisions are somewhat drastic, there is nothing therein which cannot be said to be in the interest of the public welfare and safety.  The requirement of a city license and the display of the city license number, in addition to the one required by the state, is not unreasonable.  Such city number is necessary to the ready identification of the bus, and as an aid in the enforcement of police regulations.  Other courts have held like provisions valid. *Ex parte Sullivan* (Tex.), 178 S. W. 537.

The fixing of routes and schedules is an appropriate exercise of the power granted by the legislature, and is not unreasonable.  *Ex parte Sullivan*, supra.  And the two provisions, one prohibiting trailers, and the other prohibiting overloading, are manifestly in the interest of public safety.  McQuillin on Munc. Ord., Secs. 181, 182.  It is well known that, in continental Europe, overloading of vehicles. performing the functions of common carriers, is strictly forbidden and rigidly enforced.  The provision as to illuminating the body of the bus after dark is in the interest of public safety, as is also the one requiring a full stop before crossing any street, interurban or steam railway in the city.  *Ex parte Sullivan*, supra. McQuillin on Munc. Ord., Secs. 181, 182.  The imposition of

penalties for failure to observe the provisions of the ordinance, is a perfectly proper exercise of municipal power, under a grant from the legislature "to regulate and license," and "to impose penalties for violation of any ordinance enacted in virtue thereof."

V. Lastly, it is insisted that the statute and ordinance in question were passed in the interest of the street car system, and for the benefit of "intrenched interests," with the intent and purpose of driving "jitney" busses from the streets, thus depriving plaintiff of his right to use his property and to make a living.

9. STATUTES: construction: motives actuating legislature.

If this were true, the question would be largely a political, and not a judicial one. The remedy would be at the polls, and not in the courts. But it is well settled that the motives of a city council, in passing an ordinance, or of a legislature, in enacting a statute, as a general rule, cannot be inquired into by the courts. *Swan v. City of Indianola*, 142 Iowa 731; Dillon on Municipal Corporations (5th Ed.), Sec. 580; *Doyle v. Continental Ins. Co.*, 94 U. S. 535 (24 L. Ed. 148); *People v. Gardner* (Mich.), 106 N. W. 541; *Buell v. Ball*, 20 Iowa 282.

Appellant's counsel overlook the fact that the business in which his client was engaged, and which he sought to continue, was that of a common carrier for hire, upon the streets of a city, and that he had no absolute right to engage in that business. The legislature had the undoubted right to control the use of city streets, or to delegate that power to the

10. CARRIERS: "jitneys:" regulation and control.

several municipalities, and plaintiff's business was as much subject to control as that of any other common carrier using the streets. Because of the nature of the business, the legislature had the undoubted right of regulation and control, and might exact license fees for the use of streets, or delegate this power to cities and towns; and the mere fact that the regulations are burdensome, or that they will keep some people

from following the occupation, is no reason for condemning the legislation, whether enacted by the legislature or by the city council. This same point was made in many of the "jitney" bus cases which we have already cited, and in each, it was held to be without merit.

We do not take the time to show that such legislation is presumed to be valid. It is enacted in virtue of the police power, and courts are loath to interfere therewith. When the legislature has spoken, it voices public policy, and its enactment will not be set aside, or held invalid, unless it clearly offends against some constitutional or other limitation. And so, when power to regulate, license, and control is vested by the legislature in city councils, there is a broad presumption in favor of the validity of the ordinance, and he who attacks it, must show affirmatively that it is not expressly authorized by statute, or that it is, as applied to him, unreasonable and oppressive. *Snouffer v. Cedar Rapids & M. City R. Co.*, 118 Iowa 287.

11. MUNICIPAL CORPORATIONS: powers: presumption as to validity of acts.

If an ordinance be passed in virtue of express legislative power, and substantially follows the powers granted, a court will sustain it, regardless of its opinion as to its reasonableness. *People v. Pratt* (N. Y.), 29 N. E. 7; *Pittsburg, C. C. & St. L. R. Co. v. Town of Crown Point* (Ind.), 45 N. E. 587; *People v. Armstrong* (Mich.), 41 N. W. 275; *Haynes v. City of Cape May* (N. J.), 13 Atl. 231. If passed in virtue of incidental or implied power granted by the legislature, courts will review the question of reasonableness and, if in excess of powers granted, may declare it invalid. But the unreasonable character of the ordinance must plainly appear. *Iowa City v. Glassman*, 155 Iowa 671; *Davis v. Town of Anita*, 73 Iowa 325; *Town of State Center v. Barenstein*, 66 Iowa 249; *Meyers v. Chicago, R. I. & P. R. Co.*, 57 Iowa 555. Also, cases cited in McQuillin on Municipal Corporations, Sec. 724.

12. MUNICIPAL CORPORATIONS: powers: express legislative grant.

A careful examination of the case, in the light of the

authorities and the legal principles involved, leads to the conclusion that the decree below is correct, and it is, therefore,—*Affirmed.*

All the Justices concur.